## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

IDLE H.,

                      Petitioner,

v.

PAMELA BONDI, *in her official capacity as Attorney General of the United States*; KRISTI NOEM, *in her capacity as Secretary of the United States Department of Homeland Security*; TODD LYONS, *in his official capacity as Acting Director of United States Immigration and Customs Enforcement*; and DAVID EASTERWOOD, *in his official capacity as Acting Director, St. Paul Field Office, U.S. Immigration and Customs Enforcement*,

                      Respondents.

Case No. 26-cv-315 (LMP/SGE)

### ORDER GRANTING HABEAS PETITION

---

E. Michelle Drake and Marika Kaitlin O'Connor Grant, **Berger Montague PC, Minneapolis, MN**, for Petitioner.

Ana H. Voss and Matthew F. Isihara, **United States Attorney's Office, Minneapolis, MN**, for Respondents.

       Petitioner Idle H. petitions for a writ of habeas corpus, alleging that as a refugee, he cannot be detained by Respondents (the "Government") while he maintains legal refugee status. ECF No. 1. The Government opposes the petition. ECF No. 5. For the following reasons, Idle H.'s petition is granted, and the Government is ordered to proceed in accordance with this Order.

## BACKGROUND

Idle H. is a native and citizen of Somalia who was lawfully admitted into the United States as a refugee on May 28, 2024.  ECF No. 1 ¶¶ 1, 3.  Before being admitted into the United States, Idle H., as do all refugees, underwent "the most extensive security vetting of any category of travelers to the United States."  *Id.* ¶ 20.  This vetting process can take up to two years and involves screenings by multiple federal agencies, including the National Counterterrorism Center, the FBI's Terrorist Screening Center, the Department of Defense, the Department of Homeland Security, and the Department of State.  *Id.* ¶¶ 20–22.  A noncitizen admitted as a refugee to the United States maintains lawful status unless the Government notifies the refugee in writing of its intent to terminate the noncitizen's refugee status and gives them an opportunity to respond.  *See* 8 U.S.C. § 1157(c)(4); 8 C.F.R. § 207.9.  A refugee may be placed in removal proceedings if their refugee status is terminated or if they are later found removable.  *See* 8 U.S.C. § 1159(a)(1); 8 C.F.R. § 207.9.  A refugee may apply for lawful permanent residency after one year of living in the United States.  *See* 8 U.S.C. § 1159(b).

Since Idle H. arrived in the United States, he has remained law-abiding and has maintained his refugee status.  ECF No. 1 ¶¶ 38, 41.  Idle H. has not been placed in removal proceedings, nor is he subject to a removal order.  *Id.* ¶¶ 42–43.  And in June 2025, Idle H. submitted an application for legal permanent residency.  ECF No. 7-1 ¶ 3.  Yet, on January 12, 2026, Idle H. was detained by immigration officials in Willmar, Minnesota, and he remains in the custody of United States Immigration and Customs Enforcement

("ICE").[1]  ECF No. 1 ¶¶ 1, 3.  Idle H. accordingly petitioned for a writ of habeas corpus, alleging that the Government cannot detain him while he maintains lawful refugee status. *See generally* ECF No. 1.  Idle H. brings statutory claims, a substantive due process claim, a procedural due process claim, Administrative Procedure Act claims, and a claim that ICE violated its own internal procedures by detaining Idle H.  *Id.* ¶¶ 44–68.

The Court ordered the Government to answer the petition by no later than January 22, 2026.  ECF No. 3.  The Government responded, arguing that Idle H. is lawfully detained under 8 U.S.C. § 1225(b)(2), 8 U.S.C. § 1226(a), or 8 U.S.C. § 1159(a)(1).  ECF No. 5.  Idle H. has filed a reply to the Government's arguments.  ECF No. 7.

## ANALYSIS

"Congress has granted federal district courts, 'within their respective jurisdictions,' the authority to hear applications for habeas corpus by any person who claims to be held 'in custody in violation of the Constitution or laws or treaties of the United States.'"  *Rasul v. Bush*, 542 U.S. 466, 473 (2004) (quoting 28 U.S.C. §§ 2241(a), (c)(3)).  The protections of habeas corpus extend to those in immigration detention.  *See INS v. St. Cyr*, 533 U.S. 289, 305–06 (2001).

---

[1]     Idle H. was detained on January 12, 2026, ECF No. 1 ¶¶ 1, 3, and he filed his habeas petition on January 15, 2026, *see* ECF No. 1.  At 12:24 p.m. on January 15, 2026, the Court ordered the Government to provide Idle H. and this Court at least 72-hours' notice before moving Idle H. outside of Minnesota.  ECF No. 3 at 2.  Idle H. represents that the Government transferred him to Texas "shortly after his detention" without notice to the Court.  ECF No. 7-1 ¶ 5.  Because it is unclear when Idle H. was transferred to Texas and whether it was after 12:24 p.m. on January 15, the Court cannot conclude that the Government violated the show-cause order.

I.      **Detention Under Section 1225(b)(2) or 1226(a)**

Begin with the low-hanging fruit.  The Government first claims that Idle H. is subject to mandatory detention under 8 U.S.C. § 1225(b)(2).  ECF No. 5 at 3–4.  The Court rejects that argument because it has already determined that noncitizens similarly situated to Idle H. are not subject to mandatory detention under Section 1225(b)(2).  *See Roberto M. F. v. Olson*, No. 25-cv-4456 (LMP/ECW), 2025 WL 3524455, at *4 (D. Minn. Dec. 9, 2025); *Victor Hugo D. P. v. Olson*, No. 25-cv-4593 (LMP/DTS), 2025 WL 3688074, at *2–3 (D. Minn. Dec. 19, 2025).

The Government next asserts that if Idle H. is not detained pursuant to 8 U.S.C. § 1225(b)(2), then he must be detained pursuant to 8 U.S.C. § 1226(a).  ECF No. 5 at 4.  But as this Court has previously explained, detention under Section 1226(a) is not authorized without an administrative warrant.  *See Joaquin Q. L. v. Bondi*, No. 26-cv-233 (LMP/DTS), 2026 WL 161333, at *2–3 (D. Minn. Jan. 21, 2026).  The Government has not provided a warrant for Idle H.'s arrest, so he cannot be detained under Section 1226(a).

II.     **Detention Under Section 1159(a)(1)**

That leaves the Government's last argument: that Idle H. is properly detained pursuant to 8 U.S.C. § 1159(a)(1).  ECF No. 5 at 2–3.  Section 1159(a)(1) provides that a refugee admitted to the United States "who has been physically present in the United States for at least one year" and "who has not acquired permanent resident status" shall, "at the end of such year period, return or be returned to the custody of the Department of Homeland Security for inspection and examination for admission to the United States as

4

an immigrant in accordance with the provisions of sections 1225, 1229a, and 1231 of" Title 8 of the United States Code.

The Government is correct in its reading of the text. As a matter of plain meaning, 8 U.S.C. § 1159(a)(1) provides authority for the Government to detain a refugee like Idle H. who has lived in the United States for at least one year and has not acquired legal permanent residency. *See Omanovic v. Crawford*, No. CV 06-0208-PHX, 2006 WL 2256630, at *4–5 (D. Ariz. Aug. 7, 2006). Idle H. resists this conclusion by arguing that "custody" does not mean "detention," but that argument slices the onion very thin. As a matter of plain meaning, those terms are essentially interchangeable in this context. *See Custody*, *American Heritage Dictionary of the English Language* (5th ed. 2022) (defining "custody" as, relevant here, "[t]he state of being detained or held under guard, especially by the police"); *Jennings v. Rodriguez*, 583 U.S. 281, 307–08 (2018) (equating "detain" with "custody" as a matter of "ordinary English usage" in the Immigration and Nationality Act ("INA")). Idle H. points to the Supreme Court's decision in *Clark v. Martinez*, 543 U.S. 371 (2005), which purportedly declined to interpret the phrase "returned to the custody" in a separate provision of the INA to "affirmatively authorize[] detention, much less indefinite detention." ECF No. 7 at 17–18 (quoting *Clark*, 543 U.S. at 386, 386 n.7).

But *Clark* is a slender reed on which to build Idle H.'s case because the Supreme Court did not explicitly interpret the phrase "returned to the custody," but instead was considering the totality of a 117-word regulation. *Clark*, 543 U.S. at 386, 386 n.7. It is not clear, therefore, that the Supreme Court specifically decided the meaning of the phrase "returned to the custody" in that 117-word regulation. That observation becomes even

more evident considering that the Supreme Court has equated the terms "detain" and "custody" when interpreting other parts of the INA. *See Jennings*, 583 U.S. at 307–08; *Nielsen v. Preap*, 586 U.S. 392, 404–06 (2019) (interpreting a statute requiring the Government to "take into custody" a noncitizen as creating a "mandatory detention" scheme). And Idle H.'s argument becomes weaker yet by noting that some regulations implementing the INA that include the phrase "returned to custody" certainly contemplate some length of detention. *See, e.g.*, 8 C.F.R. § 241.4(l)(1) (explaining that a noncitizen released on an order of supervision who violates conditions of release "may be returned to custody"); *Zhu v. Genalo*, 798 F. Supp. 3d 400, 411–12 (S.D.N.Y. 2025) (describing "redetention under section 241.4").

Moreover, Idle H. ignores the context in which the word "custody" is used. *See FCC v. AT & T Inc.*, 562 U.S. 397, 405 (2011) (citation omitted) (explaining that a court interprets statutory language "in light of the terms surrounding it"). Here, Section 1159(a)(1) provides that a refugee shall "return or be returned to the custody" of the Government after one year in the United States. The use of both the active voice and the passive voice in the phrase "return or be returned" plainly establishes both a voluntary option for a refugee to return to custody ("return") and a nonvoluntary option for a refugee to return to custody ("be returned"). *See* The Chicago Manual of Style ¶ 5.122 (17th ed. 2017) ("Voice shows whether the subject acts (active voice) or is acted on (passive voice)— that is, whether the subject performs or receives the action of the verb."). Still, while it appears the Government may detain Idle H., the more salient question is: for how long?

Section 1159(a)(1) does not say how long the Government may detain a refugee, and the Government's responsive briefing raises serious due process concerns. The Government does not say how long it expects Idle H.'s inspection to take; in fact, the Government does not actually offer any evidence that it is taking steps to inspect and verify Idle H.'s admissibility. According to Idle H., he underwent some sort of inspection or interview on or around January 15, 2026. ECF No. 7-1 ¶ 7. But in the two weeks since his interview, immigration officials have not provided Idle H. (or this Court) with the results of his interview or examination. *Id.* ¶ 9. Nor does the Government provide any reason why it suspects that Idle H. may be removable as a result of this interview.

In fact, the Government's reading of Section 1159(a)(1) would seem to authorize indefinite immigration detention. As previously explained, the Government has not demonstrated that Idle H. is detained pursuant to 8 U.S.C. § 1226, under which he would be entitled to a bond hearing and release on bond. *See* 8 U.S.C. § 1226(a). Nor does the Government represent that Idle H. has been placed in removal proceedings, where he would have the opportunity to seek release before an immigration judge. *See* 8 C.F.R. § 1003.19. Indeed, the Government provides no mechanism by which Idle H.—who, it bears repeating, maintains lawful status and is not in removal proceedings—can seek his release from custody. Instead, the Government interprets Section 1159(a)(1) to confer broad authority to detain refugees like Idle H., and that detention ends only when the Government is satisfied that his "inspection" is complete. When that happens, exactly, the Government does not say.

Because the Government's interpretation of Section 1159(a)(1) effectively confers the right to detain lawfully admitted refugees indefinitely, it raises "a serious constitutional problem." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). And for that reason, the Court agrees with Idle H. that his continued detention violates his procedural due process rights.[2]

The Fifth Amendment provides that the federal government shall not deprive a person—including a noncitizen—of "life, liberty, or property, without due process of law." U.S. Const. amend. V; *see Zadvydas*, 533 U.S. at 695 ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."). In determining whether civil detention violates a detainee's due process rights, courts apply the three-part test from *Mathews v. Eldridge,* 424 U.S. 319 (1976). *See Günaydın v. Trump*, 784 F. Supp. 3d 1175, 1185 (D. Minn. 2025). *Mathews* requires courts to weigh three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or

---

[2] Some courts in this District have come to this conclusion based upon the language of Section 1159(a)(1). *See U.H.A. v. Bondi*, No. 26-cv-417 (JRT/DLM), 2026 WL 222226, at *7–8 (D. Minn. Jan. 28, 2026); *Serhii L. v. Bondi*, No. 26-cv-463 (KMM/EMB), 2026 WL 184736, at *2–4 (D. Minn. Jan. 24, 2026). This Court agrees with the baseline conclusion from those cases that Section 1159(a)(1) does not authorize indefinite detention untethered from the purpose of the statute but believes that this conclusion derives more naturally from the Due Process Clause, rather than the language of the statute itself. *See Jerson A.D.G. v. Bondi*, No. 26-cv-516 (DWF/SGE), 2026 WL 207352, at *1 (D. Minn. Jan. 27, 2026) ("The Court starts and ends with Petitioner's claim that his detention violates his procedural due process rights."); *Darvin M. v. Bondi*, No. 26-cv-0437 (SRN/EMB), 2026 WL 184843, at *5–6 (D. Minn. Jan. 24, 2026) ("Petitioner has also established that he is being detained in violation of the Fifth Amendment.").

substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

### a.    Private Interest

Idle H.'s "interest in being free from physical detention" is "the most elemental of liberty interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). In fact, Idle H.'s liberty interest is perhaps even more pronounced than many litigants who claim that their confinement violates due process because unlike a noncitizen in removal proceedings, *Demore v. Kim*, 538 U.S. 510, 517–18 (2003); or a noncitizen subject to a final removal order, *Zadvydas*, 533 U.S. at 682; or a suspect arrested for alleged criminal conduct, *Gerstein v. Pugh*, 420 U.S. 103, 113–14 (1975); or others alleged to be a danger to the community, *see, e.g.*, *Addington v. Texas*, 441 U.S. 418, 425–26 (1979), Idle H. has not been accused of any wrongdoing, nor does the Government allege that he is subject to removal. Rather, Idle H. remains a refugee with legal status to live and work in the United States. ECF No. 1 ¶¶ 3, 38, 41–43; *see* 8 U.S.C. § 1157; 8 C.F.R. § 274a.12(a)(3). This *Mathews* factor therefore weighs heavily in Idle H.'s favor.

### b.    Risk of Erroneous Deprivation

Idle H. has also demonstrated that his detention—at least when it exceeds 48 hours—unacceptably risks erroneously depriving him of his physical liberty. A period of civil detention is justified by reference to the purpose for which it is instituted. *See Zadvydas*, 533 U.S. at 690 (looking to the "regulatory goals" of a statute authorizing immigration detention to determine whether a detainee's continued detention violated due

process).  Here, Section 1159(a)(1) permits detention for a specific and limited function: to allow the Government to conduct an "inspection" as to the refugee's continued admissibility for adjustment of status.[3]  That's it.  The fact that Idle H. has not applied for adjustment of status is not a basis on which to find him inadmissible and, accordingly, is not a basis on which the Government can justify his continued detention.  *See Aleksander B. v. Trump*, No. 26-cv-170 (KMM/DJF), 2026 WL 172435, at *4 (D. Minn. Jan. 22, 2026) ("[A] refugee's failure to obtain adjustment to [legal permanent resident] status by itself is not grounds for removal."); *see generally* 8 U.S.C. § 1182 (listing grounds of inadmissibility, with failure of a refugee to adjust status not among them); *id.* § 1227 (listing grounds of deportability, with failure of a refugee to adjust status not among them). Rather, any continued detention is justified only if the refugee is determined to be removable.  *See* 8 U.S.C. §§ 1225(b)(1), 1225(b)(2)(A), 1231(a), 1226(a), 1226(c) (various statutes authorizing immigration detention, all of which apply to removable noncitizens). No finding of removability has been made in Idle H.'s case.

In its briefing, the Government does not tell the Court how long it needs for an inspection under Section 1159(a)(1).  But ICE itself *has* previously explained how long such inspections should take.  In a 2010 directive issued by ICE—cited by Idle H. but

---

[3]     Curiously, neither party explains what this "inspection" specifically entails.  Is it a physical inspection, an oral interview, or something else?  Idle H.'s reply brief cites a declaration of a former employee of United States Citizenship and Immigration Services, who apparently explains that such inspections typically consist of an interview that is completed in several hours.  ECF No. 7 at 38.  But Idle H. has not filed that employee's declaration, so the Court does not consider it.  In any event, regardless of what the "inspection" entails, it can evidently be completed in 48 hours or less, as explained below.

unaddressed by the Government, *see* ECF No. 1 ¶ 67—ICE directed its field offices to follow a clear-cut rule: "[e]xcept in case of emergency or other extraordinary circumstance, [ICE] must determine, no later than 48 hours after the arrest [under Section 1159(a)(1)], whether to release the individual or issue a Notice to Appear . . . indicating the removal charge(s) applicable to the alien." U.S. Immigr. & Customs Enf't, *Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status* ("2010 Directive"), at 2 (May 10, 2010);[4] *see Jama A. O. v. Bondi*, No. 26-cv-420 (DWF/ECW), 2026 WL 185767, at *4 (D. Minn. Jan. 23, 2026) (discussing the 2010 Directive). ICE even contemplated that some inspections would take less time, noting in the 2010 Directive that "[i]f it becomes apparent earlier that no removability ground applies, the individual must be released promptly." *Id.*

It is unclear whether the 2010 Directive is still in effect, although the Government has not countered Idle H.'s assertion that it is.[5] ECF No. 1 ¶ 67. But even if the 2010

---

[4]    The 2010 Directive may be found on ICE's website at https://www.ice.gov/doclib/foia/policy/directive11039.1.pdf [https://perma.cc/9FKH-3QHF]. The Court takes judicial notice of this agency document. *See United States v. Eagleboy*, 200 F.3d 1137, 1140 (8th Cir. 1999).

[5]    If the 2010 Directive is indeed still in effect, then Idle H. would be entitled to habeas relief for the simple reason that ICE has failed to follow its internal procedures. Administrative agencies may not take action "inconsistent with their internal regulations when it would affect individual rights." *United States v. Lee*, 274 F.3d 485, 492 (8th Cir. 2001) (citation omitted); *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954) (reversing dismissal of habeas petition in which the petitioner alleged that the Board of Immigration Appeals had failed to follow its own internal procedures). Here, ICE's failure to follow the 48-hour rule articulated in the 2010 Directive clearly affects Idle H.'s individual right to remain free of arbitrary detention.

Directive is no longer in effect, it offers highly illuminating evidence demonstrating that Section 1159(a)(1) is not a free-standing grant of authority to implement lengthy detention but rather authorizes only a brief period of detention to determine if any changes in circumstances have rendered the refugee removable. *See Zadvydas*, 533 U.S. at 697–98 (looking to the history of statutory changes and prior government practice in considering the length of detention authorized by a different immigration-detention statute). In the absence of any explanation from the Government about what Idle H.'s "inspection" entails, the Court takes the 2010 Directive at its word.

The 2010 Directive's 48-hour rule also comports with the regulations guiding ICE's procedures after a warrantless arrest. After a noncitizen is taken into custody after a warrantless arrest (as ostensibly happened here, given that the Government has not produced a warrant and has not represented that it had reason to believe that Idle H. is removable),[6] the Government is required, "within 48 hours of the arrest," to determine "whether the [noncitizen] will be continued in custody or released on bond or recognizance and whether a notice to appear and warrant of arrest . . . will be issued." 8 C.F.R. § 287.3(d). The purpose of this provision, then, is to determine whether a person arrested without a warrant is inadmissible or otherwise removable from the United States, as is required to issue "a notice to appear and warrant of arrest." *Id.*; *see* 8 U.S.C. § 1229(a)(1) (explaining that a notice to appear notifies a noncitizen of removal proceedings). The

---

[6]     The Government's civil arrest warrant Form I-200 explains that it may be issued only when "there is probable cause to believe that [the noncitizen] is removable from the United States."

12

48-hour limit in 8 C.F.R. § 287.3(d) effectively mirrors the inquiry demanded by Section 1159(a)(1): a determination of whether a refugee is admissible or removable from the United States. The evaluations required by Section 1159(a)(1) and 8 C.F.R. § 287.3(d) therefore largely overlap, and it makes sense that if the evaluation required by 8 C.F.R. § 287.3(d) can be completed in 48 hours, the evaluation required by Section 1159(a)(1) can be completed in the same time frame.

Accordingly, once Idle H.'s detention exceeds 48 hours, the risk increases that his detention shifts from a lawful purpose—inspection for admissibility—to an unlawful one: detention of a refugee without any finding of removability. This conclusion is bolstered by recognizing that under Section 1159(a)(1) the Government "need not make *any* individualized or particularized justification for an action that results in the continued deprivation of liberty." *Günaydın*, 784 F. Supp. 3d at 1188; *see Perez v. Berg*, 798 F. Supp. 3d 955, 961 (D. Neb. 2025). That observation follows from a curious feature of the process for refugees to attain lawful permanent residency. As explained above, the Government is authorized to detain a refugee under Section 1159(a)(1) if the refugee has lived in the United States for at least one year and has not attained legal permanent residency. But federal law provides that a refugee *cannot* apply for legal permanent residency until they have lived in the United States for one year. 8 U.S.C. § 1159(b)(2). In theory, then, the Government is authorized to detain *all* refugees after they have lived in the United States for one year, given that it is legally impossible for a refugee to attain lawful permanent residency within one year of residing in the United States. And if the Government's interpretation of Section 1159(a)(1) is correct, the Government is entitled to detain those

13

refugees until an "inspection" regarding their admissibility has taken place. Putting two and two together leads to an impermissible outcome: the Government may indefinitely detain all refugees in the United States until the Government—and only the Government—says their inspection is complete.[7]  Not only would such indefinite, en masse detention of refugees run afoul of *Zadvydas*'s "no indefinite immigration detention" rule, but it also would necessarily lead to the erroneous detention of refugees who are not removable and should not be detained beyond the period necessary to conduct an inspection. *Zadvydas*, 533 U.S. at 690. Because Section 1159(a)(1) could be construed to authorize the Government to detain, for some period of time, every refugee on their 366th day in the country, the Court must interpret the statute cautiously and with due regard for the potential erroneous deprivations of refugees' individual liberty.

As for the value of additional procedural safeguards, the Court need not look far for those. The 2010 Directive and 8 C.F.R. § 287.3(d) provide the answer: the Government must conduct its inspection within 48 hours and, at that point, decide whether to release Idle H. or institute removal proceedings against him. This process cures the due process infirmities of the Government's interpretation of Section 1159(a)(1) while preserving the Government's interest in verifying a refugee's continued admissibility. Accordingly, the second *Mathews* factor weighs in favor of Idle H.'s position.

---

[7]     Again, the Government provides no specifics about how long Idle H.'s inspection is supposed to take, nor does it detail any steps that it is taking to undertake Idle H.'s inspection. The Government's response and the present record give little confidence to the Court that the Government truly views Idle H.'s detention as definite.

c.    **Government's Interest and Associated Burdens**

The Court finally must balance Idle H.'s "elemental" liberty interest, *Hamdi*, 542 U.S. at 529, with the Government's interest in detaining him and any "fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. The Government's interest is found in the text of Section 1159(a)(1): conducting an inspection of Idle H.'s admissibility. For five reasons, the Court concludes that, after 48 hours of detention, Idle H.'s fundamental liberty interest outweighs the Government's interest in inspecting him and the burdens attendant on that inspection.

*First*, as discussed above, federal regulations and ICE's internal guidance make clear that it is feasible to conduct an inspection under Section 1159(a)(1) in 48 hours. Indeed, the Government has historically conducted such inspections in 48 hours or less. *See* 2010 Directive. And to the extent that such inspections are not required to be completed in 48 hours, federal regulations governing warrantless arrests already require the Government to make, within 48 hours, essentially the same determination required by Section 1159(a)(1). *See* 8 C.F.R. § 287.3(d). This indicates that the Government's interest in detaining Idle H. beyond 48 hours—and the burdens associated with conducting an inspection within 48 hours—are relatively low. *See Gayle v. Warden Monmouth Cnty. Corr. Inst.*, 12 F.4th 321, 335 (3d Cir. 2021) (citation omitted) (finding "no additional burden" to the Government when the Government already demonstrated that it could implement the additional procedural requirement). The Government does not suggest otherwise.

*Second*, the purpose of a Section 1159(a)(1) inspection is to determine a refugee's continuing admissibility. But the Government does not need to detain Idle H. to find him inadmissible or removable; the Government may, at any time, issue a notice to appear to Idle H. and commence removal proceedings if it determines that Idle H. is removable. *See* 8 U.S.C. §§ 1229, 1229a. It may also seek to terminate Idle H.'s refugee status without detaining him if it determines that he was not a refugee at the time of his admission to the United States. *See* 8 U.S.C. § 1157(c)(4); 8 C.F.R. § 207.9. So, to the extent the Government claims an interest in ensuring that Idle H. remains admissible and in lawful status, it is unclear how detention is necessary to achieve that objective, when the Government is always free to reevaluate the removability of a refugee, detained or not. *See Darvin M. v. Bondi*, No. 26-cv-0437 (SRN/EMB), 2026 WL 184843, at *6 (D. Minn. Jan. 24, 2026). The Government's interest further reaches the nadir on this record, given that the Government does not dispute Idle H.'s lawful refugee status and offers no reasonable suspicion or evidence that Idle H. is actually inadmissible or otherwise subject to removal.

*Third*, the Government's interest in detention here is weaker than in a typical habeas case challenging immigration detention. Civil detention in the immigration context is ordinarily justified by the need to carry out removal proceedings and eventual deportation. *See Demore*, 538 U.S. at 526 (describing the Supreme Court's "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings"); *Carlson v. Landon*, 342 U.S. 524, 538 (1952) ("Detention is necessarily a part of th[e] deportation procedure."); *Wong Wing v. United*

16

*States,* 163 U.S. 228, 235 (1896) ("Proceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character and while arrangements were being made for their deportation."). But in this case, there are no removal proceedings, nor any suggestion from the Government that Idle H. is removable. It is true that the demands of due process may be more relaxed in challenges from other types of immigration detainees. *See Zadvydas*, 533 U.S. at 701 (holding six-month period of detention reasonable for noncitizens subject to an order of removal). But because this case involves a refugee with legal status who is not currently in removal proceedings and who is not alleged to be removable, the calculus shifts, and more stringent due process protections are required. *See Senty-Haugen v. Goodno*, 462 F.3d 876, 887–88 (8th Cir. 2006) (quoting *Mathews*, 424 U.S. at 334) ("The requirements of due process are 'flexible' and specific to each 'particular situation' . . . .").

*Fourth*, a fixed deadline to make a charging decision is nothing new for those familiar with the American criminal justice system. When a person is arrested without a warrant, the Fourth Amendment generally requires that person to be brought before a judge within 48 hours of arrest for a determination of probable cause. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56–57 (1991). In Minnesota state court, the time limit is even shorter: 36 hours. Minn. R. Crim. P. 4.02, subd. 5(1). Similarly, the "Due Process Clause forbids an extended detention, without a first appearance, following arrest by warrant." *Hayes v. Faulkner County*, 388 F.3d 669, 673 (8th Cir. 2004). These constitutional safeguards no doubt place burdens on law enforcement and prosecutors. But they are critical to vindicating the fundamental interest in physical liberty, for "the consequences of

prolonged detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships." *Gerstein*, 420 U.S. at 114. And beyond ensuring individual liberty, such safeguards serve as an important collective check on the Government's coercive power, for as Justice Frankfurter poignantly explained:

> A democratic society, in which respect for the dignity of all [people] is central, naturally guards against the misuse of the law enforcement process. Zeal in tracking down crime is not in itself an assurance of soberness of judgment. Disinterestedness in law enforcement does not alone prevent disregard of cherished liberties. Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic. The awful instruments of the criminal law cannot be entrusted to a single functionary.

*McNabb v. United States*, 318 U.S. 332, 343 (1943). Idle H. is, in all material ways, similarly situated to a criminal suspect arrested without a warrant—no wrongdoing on his part has been alleged, and the adversarial machinery of the justice system has not yet turned against him. *See* ECF No. 1 ¶¶ 41–43. Yet both he and the criminal suspect arrested without a warrant are subject to the same consequence: detention. Given that state and federal law enforcement have been subject to the 48-hour presentment requirement of *McLaughlin* for decades, the Court does not believe that a similar 48-hour inspection period under Section 1159(a)(1) would work an unreasonable fiscal and administrative burden for the Government. *See Mathews*, 424 U.S. at 335. Indeed, ICE has historically followed such a deadline. *See* 2010 Directive.

*Fifth*, the final *Mathews* factor requires consideration of the "public interest," including "financial cost[s]." *Mathews*, 424 U.S. at 347. Here, given the "staggering"

costs of immigration detention, *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017), it is not in the public's interest to continue to detain a refugee who is not accused of wrongdoing, is not alleged to be removable, and is not subject to removal proceedings or a final removal order.    Accordingly, requiring a Section 1159(a)(1) inspection to be conducted within 48 hours of arrest alleviates the Government's "fiscal and administrative burdens" of unnecessary immigration detention.    *Mathews*, 424 U.S. at 335; *see Hernandez-Lara v. Lyons*, 10 F.4th 19, 33 (1st Cir. 2021) (citing *Velasco Lopez v. Decker*, 978 F.3d 842, 854 n.11 (2d Cir. 2020)) (explaining that the third *Mathews* factor favors saving the Government "from expending substantial resources on needless detention").

In sum, on this record, all three *Mathews* factors weigh in Idle H.'s favor, so his continued detention violates his procedural due process rights.[8] As for next steps, the Court recognizes that the Government did not have the benefit of its decision when it detained

---

[8]    In his reply brief, Idle H. asserts that he is entitled to relief pursuant to a temporary restraining order issued in a class action by the Honorable John R. Tunheim on January 28, 2026.  *See* ECF No. 7 at 13–14.  The Court agrees that Idle H. is likely a beneficiary of Judge Tunheim's order.  However, given that Judge Tunheim's order was issued after the deadline for the Government to respond to Idle H.'s petition, the Court adjudicates Idle H.'s petition on its own merits.  Indeed, Idle H. filed his habeas petition on January 15, 2026, several days before the class action was filed before Judge Tunheim.  *Compare* ECF No. 1, *with U.H.A. v. Bondi*, No. 26-cv-417 (JRT/DLM), ECF No. 1 (D. Minn. filed Jan. 18, 2026).  Idle H. is entitled to an individualized determination on his first-filed claim.  More to the point, Judge Tunheim ordered the immediate release of class members like Idle H., ECF No. 7 at 2, but as of the issuance of this Order, ICE's Online Detainee Locator System indicates that Idle H. remains detained.  Plus, on January 31, the Government filed a motion to dissolve the temporary restraining order issued by Judge Tunheim.  *U.H.A. v. Bondi*, No. 26-cv-417 (JRT/DLM), ECF No. 55 (D. Minn. filed Jan. 31, 2026).  The Court therefore believes it is in Idle H.'s best interest to have his petition adjudicated on its own merits, so that his relief is not impacted by the Government's opposition to Judge Tunheim's order.

Idle H.  Therefore, the Court will order the Government to conduct its Section 1159(a)(1) inspection of Idle H. within 48 hours.  At that point, the Government must either (1) release Idle H. or (2) issue a notice to appear to Idle H., if it is determined that he is removable. Continued detention is not authorized under Section 1159(a)(1) after 48 hours.[9]

## CONCLUSION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Idle H.'s Petition for a Writ of Habeas Corpus (ECF No. 1) is **GRANTED** as follows:

    a.  The Government is **ORDERED** to complete any Section 1159(a)(1) inspection of Idle H. no later than 4:00 p.m. CST on February 4, 2026. At that point, the Government must either (1) release Idle H. or (2) issue a notice to appear to Idle H., if it is determined that he is removable.  Continued detention of Idle H. beyond 4:00 p.m. CST on February 4, 2026, is not authorized under Section 1159(a)(1).

    b.  No later than 4:00 p.m. CST on February 5, 2026, the Government is **ORDERED** to provide a status report confirming that an inspection pursuant to Section 1159(a)(1) has been completed (or if no inspection

---

[9]   Because the Court grants relief on Idle H.'s procedural due process claim, it does not reach his other claims.

is completed, confirming that Idle H. has been released from custody)

and stating the outcome of that inspection.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 2, 2026                *s/Laura M. Provinzino*
                                       Laura M. Provinzino
                                       United States District Judge